IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2020

## STATE OF TENNESSEE v. DONALD HOLLON RUNIONS

**Appeal from the Circuit Court for Lewis County**
**No. 2016-CR-62    James G. Martin, III, Judge**

_____

### No. M2019-00940-CCA-R3-CD

_____

The Defendant, Donald Hollon Runions, was convicted of two counts of violation of the Child Protection Act, Class A felonies; four counts of rape of a child, Class A felonies; and two counts of aggravated sexual battery, Class B felonies, and he was sentenced to an effective term of fifty years in the Department of Correction. On appeal, the Defendant argues that: (1) the evidence is insufficient to sustain his convictions; (2) the Child Protection Act, Tennessee Code Annotated section 39-13-518, is unconstitutional; and (3) case law applied in his case to allow certain credibility evidence should be overturned. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Douglas Thompson Bates, IV, Centerville, Tennessee, (on appeal); and William Mullican, Franklin, Tennessee, (at trial), for the appellant, Donald Hollon Runions.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Kate Yeager Delk and Jennifer Mason, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant was charged in a nine-count indictment of various sexual abuse related offenses against two of his granddaughters by marriage. One count, an attempted

aggravated sexual battery charge, was dismissed, and the jury convicted the Defendant as charged of the remaining counts. The following is a summary of the proof at trial.

## State's Proof

The Defendant's wife and victims' grandmother testified that she and the Defendant married in 2015, and she had three children from a previous relationship. One of her sons was the father of the older victim, who was five years old at the time in question, and her daughter was the mother of the younger victim, who was three years old at the time in question. She said that her children liked the Defendant, and there were no family disputes going on during the time period at issue. However, she and the Defendant's relationship was "rocky" for a while, with "[d]isagreements [between them] on a lot of things."

The Defendant's wife recalled that on October 30, 2015, she and the Defendant lived on Old Linden Road in Lewis County. They moved to the Old Linden Road home on September 25, 2015, from a home on Buffalo Road that was also in Lewis County. They moved to the Buffalo Road home sometime in the summer of 2015 and only lived there a couple of months. Prior to that, they lived in a home on Warren Hollow Road in Lawrence County for several years. The home on Buffalo Road had a porch swing and a boat that the Defendant was repairing. The Defendant's wife agreed that the Defendant owned some tools, including a hammer.

The Defendant's wife testified that she babysat her daughter's children during the timeframe of the summer of 2015 through October 2015, usually on Thursdays. Because she babysat both the younger victim and her baby sister, the younger victim would go off with the Defendant while she watched the baby. She acknowledged that there were times that the Defendant and the younger victim would be in the yard out of her sight. During that same timeframe, her son and daughter-in-law and their children visited frequently, sometimes every other day.

The Defendant's wife said that her grandchildren referred to the Defendant as "Paw Paw" and that they loved him. Her grandchildren "would go outside and walk around with him or whatever." At the Buffalo Road home, the Defendant had a boat that he worked on, and her grandchildren would hang out with him while he worked on it. The Defendant's wife said that at the Linden Road home, the Defendant had a CB radio set up in his "man cave" and that the children would often go back there and listen to the radio with him. The Defendant's wife agreed that a person sitting in the living room, as opposed to standing, could not see into the "man cave."

The Defendant's wife recalled that on October 30, 2015, she was babysitting the younger victim and the younger victim's baby sister at the Linden Road home. The

- 2 -

younger victim spent time with the Defendant while she took care of the baby. She left with both children around 2:00 p.m. to return them to their mother.

On cross-examination, the Defendant's wife clarified that she never babysat the older victim, but the older victim would come with her parents to visit. However, the older victim's parents would stay inside the house while the older victim followed the Defendant around. She did not recall the Defendant and the older victim ever leaving in a vehicle together. The Defendant's wife said that the Defendant was never alone inside the home with the older victim except when he was using his CB radio.

The Defendant's wife said that the older victim and her parents also came to her home on October 30, 2015, while she was babysitting the younger victim. However, the victims did not play together that day because the Defendant's wife had to leave soon after they arrived to return the younger victim to her mother, a trip that took about an hour and a half. The Defendant's wife said that she never saw the Defendant behave inappropriately with her grandchildren, elaborating "because I don't pay attention because I trusted him." She never heard him scold either of the victims or call them a name. The Defendant's wife stated that the Defendant was home every time the older victim and her family came to visit because they would visit in the afternoon when the Defendant was home from work.

On redirect examination, the Defendant's wife acknowledged that the Defendant had disciplinary power over her grandchildren to scold them if they did something wrong. She said that during the time period at issue, the Defendant never spent the night away from the home because of work. She recalled that she and the Defendant had four vehicles parked in their driveway and that the children would play around where the vehicles were parked.

Investigator Ricky Frakes with the Department of Children's Services ("DCS") testified that he was assigned to the younger victim's case on November 2, 2015, and was assigned to the older victim's case on November 3rd. He said that when he received the older victim's case, he suspected that the two cases might be related. Mr. Frakes recalled that he first met with the younger victim alone in the kitchen of her home and then scheduled a forensic interview with her. He then met with the older victim and her parents and scheduled a forensic interview for the same day as the younger victim's interview. Mr. Frakes agreed that he could be described as a tall, "robust" man.

Mr. Frakes testified that he was present for the forensic interviews that took place at Kid's Place, observing them both on a TV monitor. The only person allowed in the room with the respective victim was the forensic interviewer, who did not work for DCS or law enforcement. A couple of weeks after the forensic interviews, the victims were taken in for physical examinations. As part of his investigation, Mr. Frakes also met with the

Defendant in his home. Mr. Frakes then presented the case to a multi-disciplinary child protective investigation team. Afterwards, he spoke with the Defendant and, subsequently, met with the child protective team again. At trial, Mr. Frakes identified a photograph that was sent to him by the younger victim's mother.

On cross-examination, Mr. Frakes acknowledged that he never had a one-on-one conversation with the older victim.

The younger victim's mother testified that she was attending college during the time period at issue and her mother, the Defendant's wife, would watch her baby and the younger victim on Thursdays. In addition, she visited her mother and the Defendant's home approximately ten times during that time period. She specifically recalled visiting on July 4th and noted that the Defendant was present. She recalled that she was "getting along" with her mother and the Defendant during that time frame. She said that the younger victim was three years old during the relevant timeframe and was "pretty outgoing," had good verbal skills, and was potty-trained.

The younger victim's mother remembered that the Defendant had a boat that he was working on at both the Linden Road and Buffalo Road homes. There was also a swing outside the Buffalo Road home. The younger victim's mother recalled that the younger victim "loved on" the Defendant, and he would take her outside to play. The younger victim's mother said that the term "blue house" referred to a blue shed that was at the Lawrenceburg home. She recalled that the blue shed was "up on a hill behind [the Defendant's] shop where he had chickens and ducks and the kids loved to go see them."

The younger victim's mother recalled that on Friday, October 30, 2015, she attended a field trip with her older child while her mother watched the younger victim and the baby for her. She met her mother at a halfway point to drop off the children around 7:15 a.m. and then again to pick them up around 3:30 p.m. After picking up the children, they went home and she began making dinner. While she was cooking, the younger victim's older sister came in and told her something that led her to "immediately pull[] [the younger victim] into the living room" and talk to her. The younger victim was "upset and crying." Later, the younger victim's mother and father spoke with her again together, and the younger victim was "still upset." They contacted the police as a result of their conversation with the younger victim but, with it being a weekend, did not speak to an investigator for a couple of days. The younger victim's mother then recounted Mr. Frakes' in-home interview with the younger victim, as well as taking her for a forensic interview and medical examination.

- 4 -

At this point in the younger victim's mother's testimony, the court conducted a jury-out hearing on the State's seeking to introduce proof of the younger victim's behavioral changes, pursuant to State v. Larry Michael Berkley, No. W2015-00831-CCA-R3-CD, 2016 WL 3006941 (Tenn. Crim. App. May 17, 2016), perm. app. denied (Tenn. Sept. 23, 2016). The younger victim's mother testified that in the summer of 2015, the younger victim began staying off to herself and did not like to play with other kids. The younger victim also had "very bad anger." The younger victim's mother was not concerned, however, assuming it was just a stage of growing up.

After October 30, 2015, the younger victim's mother noticed further changes in the younger victim's behavior. She said that the younger victim became "very aggressive." For example, she hit her cousin with a hammer and, when asked if she knew it was wrong, said that she knew it was wrong and did not know why she did it. The younger victim also started talking like a baby, urinating on herself after having been fully potty trained, and intentionally breaking toys. The younger victim's mother further observed the younger victim touch her dolls on their private parts, with their clothes off, on at least three occasions. On one occasion when the younger victim's mother said that it was naughty and not to do that, the younger victim said, "paw-paw done it so she can, too." In addition, the younger victim touched her older sister on the vagina.

After a lengthy review, the trial court held that testimony about the younger victim's changes in behavior was relevant and admissible because, pursuant to Larry Michael Berkley, the changes in behavior assisted the jury in evaluating the victim's credibility. The court gave the jury a limiting instruction that the testimony about the younger victim's changes in behavior was only to be considered for assessing the younger victim's credibility and not as evidence of sexual abuse. The court also gave a limiting instruction that certain statements made by the younger victim to her mother were to only be considered for assessing the younger victim's overall credibility and not as evidence of the Defendant's guilt.

In the presence of the jury, the younger victim's mother then testified consistently with her jury-out testimony regarding the younger victim's changes in behavior and statements she made. The younger victim's mother said that during the period of summer to fall 2015, the younger victim and older victim may have seen each other around ten times at the Defendant's house. She did not recall them seeing each other after October 30th. The younger victim's mother said that she did not have a close relationship with the older victim's mother and that they had never talked about what had occurred with the Defendant.

On cross and redirect examinations, the younger victim's mother recalled that the first incident with the doll occurred "right before June." She said that the younger victim

"was touching the baby on the vagina." She recalled that the second incident occurred near the end of July or beginning of August. The younger victim's mother acknowledged that she and the older victim's mother were friends at one point but that ended when the older victim's mother and the younger victim's mother's brother split up.

The younger victim's mother said that the younger victim had always been rambunctious but not like the aggressive and rough behavior she exhibited from June through November 2015. However, she admitted that the younger victim had given her sister a black eye in 2013 using a sippy cup.

The younger victim's mother admitted that she had been raised by her father and did not have much of a relationship with her mother, the Defendant's wife, prior to 2013. When the younger victim's mother was about twenty-five years old, she invited her mother to a birthday party and their relationship rekindled from there.

The younger victim's mother acknowledged that she urged her mother to leave the Defendant a number of times between 2013, after she and her mother had rekindled their relationship, and April 2015, when her mother and the Defendant married. She explained that she wanted her mother to leave the Defendant because "he would always call her names, fat, ugly, nobody would ever want her, that she wasn't pretty. He was very abusive." However, the younger victim's mother did not encourage her mother to leave the Defendant after they were married because the Defendant had come to her during a period of separation asking how he could end their separation. She told the Defendant that he needed to change his behavior and, after they were married, it seemed that he had changed "[i]n some ways." She felt comfortable with the Defendant and letting her children be around him.

The younger victim's mother admitted that the Defendant's home on Buffalo Road had a steep drop off into the river and that there were times when they visited there that the younger victim was out of her sight. However, on those occasions, her mother or the Defendant were watching the younger victim.

The younger victim's mother recalled that the Defendant "loved on" his wife's grandchildren "quite a bit. They w[ere] always sitting in his lap." He would sometimes chastise the children when they misbehaved but just in a typical fashion. Moreover, although he was a heavy smoker, he usually would not smoke around the children.

Cindy Powell, a forensic interviewer for Kid's Place, first discussed the purpose of Kid's Place and her qualifications. She explained how the interview room was set up and how interviews were generally conducted, as well as the specifics of the younger victim's interview. She said that she does not use leading questions during her interviews because

she wants what the child talks to her about to be in his or her words. Ms. Powell asked the younger victim questions to gauge her understanding of real and make-believe, and determined that the younger victim could answer a question when it was posed directly but did not understand the concept of real and made up.

Ms. Powell testified that she had the younger victim identify male and female body parts on anatomical drawings to glean what she called the various body parts. Ms. Powell felt that the younger victim had a typical understanding of body parts for her age. She recalled that the younger victim referred to the penis as the "boy moo-moo" and said that she had seen that body part on "Paw Paw." The younger victim told Ms. Powell that "[Paw Paw] stick his pointy at me." The younger victim responded in the negative when asked whether "Paw Paw" had touched her with that body part or asked her to touch that body part on him. However, the younger victim then indicated that she had touched that body part with her finger and that "Paw Paw" had said "come here."

Ms. Powell recalled that the younger victim asked to go to the restroom during the interview, and that from her experience, children who have been sexually abused often say they need to use the restroom when they start talking about anything related to sexual abuse. However, Ms. Powell acknowledged on cross-examination that she did not follow the younger victim to the restroom to observe if she might have actually just needed to use it.

Ms. Powell stated that she viewed the videotape of her interview of the younger victim and prepared a transcript to aid the jury as they watched the video. The transcript reflects that the younger victim stated that she had seen a "boy moo-moo" on "Paw Paw," and that "he stick his pointy at me." She said that he told her to "come here" and she touched it with her finger. She said she was sitting down and he was standing up when it happened. Asked if it happened more than once, the younger victim said, "I don't know." She said that she was inside the "blue house" at "Nanna's" when it happened.

The State relied on the forensic interview of the younger victim rather than calling her at trial, but she was made available for cross-examination by the defense. On cross-examination, the younger victim testified that she remembered recently watching a videotape of herself in a room talking with someone, but she did not remember the actual interview or the things she talked about in the video. On redirect, the younger victim stated that she listened to what she said in the video and when asked if what she told Ms. Powell was the truth, she replied, "yes."

The older victim's mother testified that the older victim was born in 2009 and the older victim's father, with whom she had an on-again, off-again relationship, was the son of the Defendant's wife. She recalled that in the summer and fall of 2015, she and the older victim's father and their children, including the older victim, visited the Defendant and his

- 7 -

wife at their home. The older victim's father helped the Defendant with projects around the house, while she and the children spent time with their grandmother. They visited a few times in the summer and almost every day in September and October. In addition, there were some occasions when her children were at the Defendant's home without her or the older victim's father being present.

The older victim's mother testified that she often took photographs of her children with her phone when they visited with the Defendant and his wife. She identified several photographs that indicated the older victim was at the Defendant's residence multiple times in September and October 2015.

The older victim's mother recalled that the older victim referred to the Defendant as "Paw Paw" and liked to hang out with him while he fixed things or worked on his boat. The older victim's mother acknowledged that the older victim would sometimes be out of her eyesight when she had to attend to her other children. However, she did not have any concerns about the older victim being around the Defendant.

The older victim's mother testified that prior to June 2015, the older victim was "a free heart" who was "always smiling and laughing, just happy about everything." However, the older victim's mother acknowledged that there was an incident in early 2015 when the older victim's mother caught the older victim touching her own vagina and later incidents when she was caught touching her siblings' private parts. The older victim's mother said that after June 2015, the older victim became "real secretive, real quiet, . . . [and] would hide things." She "just kind of shut down" and "[y]ou . . . noticed . . . like a darkness over her." She also became very angry and was mean to animals. When the older victim's mother asked the older victim what was going on with her, the older victim "would just act as if everything was okay[.]"

The older victim's mother recalled that on November 2, 2015, they received a call from the older victim's father's father and, as a result of that conversation, the older victim's father took the older victim aside to talk to her. When the older victim's father returned, he "looked like he wanted to rip someone's head off." The older victim had her head down and was crying. The older victim's father left the house, and the older victim's mother tried to talk to the older victim. The older victim was "very upset and sad" and "didn't really want to open up[.]" The older victim thought that she was going to be in trouble for what she had to tell her mother. At this point, the trial court again gave a limiting instruction that testimony regarding behavioral changes was only to be considered for credibility purposes.

The older victim's mother testified that she accompanied the older victim to a forensic interview and examination. Several days later, she sent a photograph to DCS

Investigator Frakes of a pair of the older victim's underwear that had a hole in the crotch. She found the underwear hidden in the back of the closet where they normally could not be seen.

On cross-examination, after lengthy argument by the State and defense counsel, the trial court allowed the older victim's mother to testify that over Christmas break in late 2015 / early 2016, the older victim told her about a few incidents during the past month at school when another child touched her private area. The situation was addressed and resolved. The older victim's mother said that the older victim's behavioral issues had gotten better toward the end of 2015, although there was still some anger and secretive behavior occurring.

The older victim's mother said that the Defendant treated the children "like any paw-paw, you know, nice to them, if they do something wrong, get on to them." However, she recalled that there were instances when the Defendant would urinate outside in front of her and the children, elaborating that "he was like whipping his penis out and try[ing] to pee in front of us[.]" She remembered that almost every time they visited the Defendant's house in October 2015 and she went outside and the Defendant "was out there, he was trying to whip it out in front of me and my kids were sometimes with me."

On redirect and re-cross examinations, the older victim's mother said that her family did not spend much time with the younger victim's family, aside from on holidays. The older victim's mother said that the older victim came to her during Christmas break of 2015 and told her about the touching incidents at school. She elaborated that "[a]fter everything that happened to her and stuff, she learned how to like open up and talk to her mother, not hide and be secretive. So she broke down crying when she told me this." The older victim indicated to her mother that the touching incidents at school had happened recently, like in the past couple of weeks, but she did not give a specific time frame.

Cindy Powell was recalled to testify concerning her forensic interview with the older victim. She said that the older victim was able to give more information than the younger victim because she was older. The older victim was also able to distinguish between real and made up, and identify body parts that should be private. Ms. Powell recalled that at the beginning of the interview, the older victim asked if she was there to talk about Donnie, the Defendant, so Ms. Powell asked the older victim to tell her about the Defendant. The older victim said that the Defendant lived with "daddy's mama," and that the Defendant "was mean to her; he hurt her and he touches her wrong." The older victim identified on an anatomy drawing of a female body where the Defendant touched her that was wrong.

The video of the older victim's forensic interview showed Ms. Powell telling the older victim that the room was a safe place, and the older victim asked, "Is this about [the Defendant]?" Ms. Powell asked the older victim to tell her about the Defendant, and the older victim said that the Defendant was "mean to her, hurts her, and touches her wrong." The older victim stated that the Defendant lives with her "daddy's momma." Asked what the Defendant does to her that is mean, the older victim said that he hits her with a hammer.

The older victim said that the Defendant "touches her wrong" and marked on an anatomy drawing of a female body where he touched her. The older victim identified and named several body parts on an anatomy drawing and then identified the body parts that should be kept private. The older victim identified a vagina and said that the Defendant touched her vagina with his hand. She said that she told him, "No, we don't do that," and the Defendant said, "Yes, we do." She said that it happened more than one time and then counted on her fingers to eight times.

The older victim told Ms. Powell that the first time the Defendant touched her was at the house trailer and that she and the Defendant were out back while the others were out front. She also said it happened when she was outside in the big swing and that the Defendant came up to her and was "peeing." She recalled that the Defendant touched her under her clothes, and she described what she was wearing. She said that he touched her with his hand, on her skin and not clothes. She recalled that his hand moved and touched inside her vagina. He did not say anything when he touched her.

The older victim said that the Defendant also touched her in the car and inside the living room of the house trailer. The older victim recalled that with the incident in the car, just she and the Defendant were in the car and he made her drive and they were going to Sonic. The older victim said that with the incident inside the house, the Defendant came up to her and touched her vagina with a hammer. Using a male anatomy drawing, the older victim circled the penis, which she identified as a "goober," and said that the Defendant showed it to her and made her touch it. His clothes were off and they were in the living room while everyone else was outside.

At trial, the older victim testified that she knew the difference between the truth and a lie. Asked what she remembered about the Defendant, the older victim said that "[h]e's mean," but she could not remember what he did that was mean. The older victim acknowledged that she had watched a video of her interview with Ms. Powell and said that the things she told Ms. Powell in the interview were true. However, she did not remember any of the things that the Defendant did to her, but she acknowledged that the Defendant touched her. The older victim identified a photograph of her underwear with a hole torn in the crotch. She did not know how the hole got in her underwear. The older victim did not remember helping the Defendant fix a boat, but she remembered a swing. The older victim

confirmed that she was very nervous about testifying. On cross-examination, the older victim agreed that she did not remember what happened at the Defendant's house. On redirect examination, the older victim clarified that she did not help the Defendant fix a boat, but she did go to a boat with the Defendant.

Lisa Baeza, a social worker with Our Kids, participated in the medical examinations of the victims, which were conducted by a nurse practitioner. She obtained a medical history from the younger victim's mother, but she spoke with the older victim directly regarding her medical history. Ms. Baeza recounted her interaction with the older victim as follows:

> She was asked if anyone had ever touched her vagina and she said, "Yes, my dad's dad did." That – that was in a quote, she – Donnie. She stated that Donnie had touched her with his hand. She was asked if she was touched on her clothes or on Paw-Paw, the skin, and she did not answer that. She was asked if – if she was touched on the inside or the outside of her vagina, and she stated it was on the inside. After she told me it was on the inside, she – she looked up from drawing and – and said, can I – can I tell you something? And she then appeared to be frustrated. She – or she said, "He didn't do it." And I said – she was asked why she said that he did it, and then that's when she appeared to be frustrated and she kind of just put her – her head in her hand, like this, and – and it's held in a frustrated manner and she said, (frustrated sound) because he did do it, in kind of a higher octave.

> And after she confirmed that he did do it, I continued to collect a medical history from her. And I asked her if – if that had happened one time or more than one time? And she answered again, have her hands in her head and said that it happened more than one time. She was asked if her vagina was touched in any other way and she did not answer that, I believe. She was asked if anyone had ever touched her butt and she said, no. She was asked if she had touched Donnie in any way. She said, no. And she was asked if anyone else had ever touched her private parts and she said, no.

Ms. Baeza said that before she had this conversation with the older victim, she had explained to her that she was going to have a medical examination afterwards and that someone would be looking at her private parts. On cross-examination, Ms. Baeza acknowledged that her asking the older victim why she had said Donnie had touched her was a poorly structured question.

Heidi Dennis, the nurse practitioner who conducted the medical examinations of the victims, testified that her examinations of both victims revealed no signs of trauma.

- 11 -

However, she said that with regard to examinations on children less than twelve years old, "there is very, very, very little chance that there's going to be any sort of injury" to the genital area because the area is expected to stretch and heals very quickly. Moreover, if the allegations were that the child touched a man's penis, she would not expect to find any injury to the child's genital area. She said that her findings in no way ruled out the possibility that either child was the victim of sexual abuse. However, Ms. Dennis agreed on cross-examination that one explanation for her findings was that nothing occurred.

Investigator Todd Laster with the Lewis County Sheriff's Department testified that he began his investigation by reviewing the reports prepared by the responding officers in each victim's case. He determined that the two victims were cousins and that the same offender was named in both cases. Investigator Laster spoke with the Defendant at his Linden Road home. He recalled that there was a boat "towards the back of the house."

Investigator Laster said that he presented the case to the multi-disciplinary child protective investigative team, and the case was classified as "[a]llegations substantiated, perpetrator substantiated" and forwarded to the district attorney's office. Investigator Laster stated that he did not apply for a search warrant in the case because such was unnecessary in light of the allegations.

Investigator Laster was asked about the older victim's statement to Ms. Baeza in which she said that something happened with the Defendant, then said something did not happen, and then again said that something did happen. Investigator Laster was not concerned with the older victim's swaying because he agreed with Ms. Baeza's assessment that the older victim was "exhausted, frustrated[,] [and] this was no less than the sixth time she's had to say this. I'm sure she was over it, especially after just being described to her what kind of medical exam she was about to have to go through." He recalled that, although not common, he had had previous cases where a child victim would "say something happened and then say it hasn't happened[.]"

**Defendant's Proof**

William Daniel Scott, the Defendant's cousin, testified that he resided close to the Defendant in the summer and fall of 2015 when the Defendant lived at the Linden Road home and, during that time, visited the Defendant "[a]t least three or four times out of the week." He saw the older victim and her family at the Defendant's house "[m]aybe four times" during that timeframe. Mr. Scott said that he never saw the Defendant go outside the residence with one of the children. Asked if there was a time when both the Defendant and one of the girls was out of his field of vision at the same time, Mr. Scott responded in the negative.

- 12 -

On cross-examination, Mr. Scott acknowledged that an individual in the living room of the Defendant's home on Linden Road might not be able to see into the adjacent room with the CB radio depending on where the person was situated, and vice versa. Mr. Scott recalled that the Defendant had four vehicles at the Linden Road home, along with a boat that was "right up against the house." Mr. Scott did not recall the Defendant's home on Buffalo Road. However, he recalled helping the Defendant move into the Linden Road home, as well as there being a flat-bed trailer that was used in the move. Mr. Scott admitted that he did not know what went on at the Defendant's home when he was not present. He agreed that although he never saw the Defendant go outside with the older victim, he could not definitively say that the Defendant never went outside with any of the children. Mr. Scott said that he had no knowledge regarding any interactions the Defendant had with the younger victim's family.

## ANALYSIS

On appeal, the Defendant argues that: (1) the evidence is insufficient to sustain his convictions; (2) the Child Protection Act, Tennessee Code Annotated section 39-13-518, is unconstitutional; and (3) case law applied in his case to allow certain credibility evidence should be overturned.

## I. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his convictions. He does not specifically challenge the elements of any of the offenses but instead essentially argues that the victims' accounts were not credible. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315

S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The Defendant challenges the credibility of the victims' allegations, pointing to the brief recantation by the older victim in her forensic interview and that the victims said some things in the forensic interviews that were not delved into by the interviewer. However, the jury reviewed the videotapes of the forensic interviews and the defense cross-examined the interviewer as well as the rest of the investigative team. Members of the investigative team offered possible explanations for the older victim's brief recantation and provided reasoning for the lines of questioning pursued. The jury chose to accredit the forensic interviews and deemed the victims credible despite the older victim's brief recantation or any questions arising in the interviews. The uncorroborated testimony of a child victim of sexual abuse is sufficient to support a child rape conviction, and "a jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or

- 14 -

unsatisfactory as to create reasonable doubt of the [defendant's] guilt.'" State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003) (quoting State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). Moreover, here, the credibility of the victims' allegations was additionally supported by the victims' mothers' testimony about changes in the victims' behavior they had noticed during the time period of the sexual abuse. The Defendant is not entitled to relief on this issue.

## II. Constitutionality of the Statute

The Defendant next argues that the Child Protection Act, Tennessee Code Annotated section 39-13-518, which permits multiple acts of sexual abuse against one or more child victims to be charged as a single offense, is unconstitutional.

Tennessee Code Annotated section 39-13-518 creates the offense of continuous sexual abuse of a child and provides that a person commits said offense who:

> (1) Over a period of ninety (90) days or more, engages in multiple acts of sexual abuse of a child as defined in subdivision (a)(1)(A)(i) or (a)(1)(A)(ii); or
> (2) Over a period of less than ninety (90) days, engages in multiple acts of sexual abuse of a child as defined in subdivision (a)(1)(A)(iii).

Tenn. Code Ann. § 39-13-518(b)(1), (2). Relevant here, multiple acts of sexual abuse of a child means engaging in three or more incidents of sexual abuse of the same child on separate occasions, or engaging in five or more incidents of sexual abuse of two or more different children on separate occasions. Id. § 39-13-518(a)(1)(A)(i), (iii). The victims of the incidents of sexual abuse must share "distinctive, common characteristics, qualities or circumstances with respect to each other or to the person committing the offenses, or there are common methods or characteristics in the commission of the offense[.]" Id. § 39-13-518(a)(1)(B). "Common characteristics" include that the victims are related to the defendant by blood or marriage[.]" Id. § 39-13-518(a)(1)(B)(i). Rape of a child and aggravated sexual battery both qualify as sexual abuse of a child. Id. § 39-13-518(a)(2)(C), (D). Subsection (e) sets out that the jury must unanimously agree that the defendant:

> (1)(A) During a period of ninety (90) or more days in duration, committed three (3) or more acts of sexual abuse of a child; or
>
> (B) During a period of less than ninety (90) days in duration, committed five (5) or more acts of sexual abuse of a child against at least two (2) different children; and

- 15 -

(2) Committed at least three (3) of the same specific acts of sexual abuse within the specified time period if prosecution is under subdivision (e)(1)(A) and at least five (5) of the same specific acts of sexual abuse within the specified time period if prosecution is under subdivision (e)(1)(B).

Id.

Subsection (f) of the statute provides for joinder of continuous sexual abuse of a child with the separate acts of child sexual abuse that constitute the offense:

The state may charge alternative violations of this section and of the separate offenses committed within the same time period. The separate incidents shall be alleged in separate counts and joined in the same action. A person may be convicted either of one (1) criminal violation of this section, or for one (1) or more of the separate incidents of sexual abuse of a child committed within the county in which the charges were filed, but not both. The state shall not be required to elect submission to the jury of the several counts. The jury shall be instructed to return a verdict on all counts in the indictment. In the event that a verdict of guilty is returned on a separate count that was included in the notice of separate incidents of sexual abuse of a child and the jury returns a verdict of guilty for a violation of this section, at the sentencing hearing the trial judge shall merge the separate count into the conviction under this section and only impose a sentence under this section. A conviction for a violation of this section bars the prosecution of the individual incidents of sexual abuse of a child as separate offenses described in the pretrial notice filed by the state and presented to the jury. . . .

Id. § 39-13-518(f).

Prior to trial, the Defendant filed a motion to dismiss the two counts of the indictment charging violation of the Child Protection Act, asserting that the statute "violates the separation of powers doctrine" and "is an unconstitutional attempt to create a legislative exception to Tennessee Rule of Evidence 404 and Tennessee Rule of Criminal Procedure 14." The State filed a lengthy response, and the trial court conducted a hearing on the issue. The transcript of the hearing is not included in the record on appeal, but the trial court held in its written order as follows:

1. [The Child Protection Act] is a legitimate exercise of the legislative body and does not violate the separation of powers doctrine;

2.      There is not a danger of unfair prejudice as the [c]ourt finds that the statute was drafted to comply with the rule prohibiting use of uncharged misconduct as propensity evidence;

3.      This [c]ourt finds that [the Child Protection Act] is constitutional and does not violate the separation of powers;

4.      This [c]ourt also finds that [the Child Protection Act] does not conflict with Tennessee Rules of Evidence 404 as Rule 404 contemplates excluding propensity evidence as uncharged misconduct and other bad acts. Since [the Child Protection Act] allows for the incorporation of multiple acts to constitute the offense, the "other bad acts" are not uncharged misconduct, they are part of the charged conduct.

As we understand, the gist of the Defendant's argument is that the Child Protection Act is a loophole by the Legislature to "work around" Tennessee Rule of Evidence 404(b), which excludes propensity evidence, and Rule 14 of the Tennessee Rules of Criminal Procedure, which governs severance and joinder, and thus violates the separation of powers doctrine.

Initially, we begin with the presumption that an enactment of the General Assembly is constitutional. State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007) (quoting Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003)). It is the task of the Legislature and not the courts "'to define what shall constitute a criminal offense and to assess punishment for a particular crime.'" State v. Farner, 66 S.W.3d 188, 200 (Tenn. 2001) (quoting State v. Burdin, 924 S.W.2d 82, 87 (Tenn. 1996)). "In construing statutes, it is our duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." State v. McCoy, 459 S.W.3d 1, 8 (Tenn. 2014) (quoting Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 529 (Tenn. 1993)).

The Child Protection Act created a new criminal offense that is established by proving certain enumerated sexual crimes against one or more children within a specified time period. As persuasive authority, we note that the Texas Court of Appeals in addressing a similar statute observed that the offense of continuous sexual abuse was created "in response to a need to address sexual assaults against young children who are normally unable to identify the exact dates of the offenses when there are ongoing acts of sexual abuse." Baez v. State, 486 S.W.3d 592, 595 (Tex. Ct. App. 2015). In our view, the Child Protection Act is not a way to "work around" evidentiary and procedural rules, but is instead a way to address this concern. Because the State must prove the separate incidents in order to make out the continuing offense, the underlying crimes are not "other bad acts" for purposes of Tennessee Rule of Evidence 404(b), they are part of the charged

- 17 -

misconduct. Cf. State v. Antonio Dockery, No. W2012-01024-CCA-R3-CD, 2014 WL 172379, at *14-15 (Tenn. Crim. App. Jan. 15, 2014), perm. app. denied (Tenn. May 14, 2014) (concluding that 404(b) procedure unnecessary in stalking case where evidence of prior misconduct was admitted to support the stalking conviction, which required proof that the defendant engaged in the prohibited misconduct on two or more separate occasions).

Likewise, the Child Protection Act does not infringe on the rules of criminal procedure regarding joinder and severance because there is no constitutional right to a bifurcated trial in cases requiring proof of multiple acts to support a single conviction. Cf. State v. Hinsley, 627 S.W.2d 351, 353-56 (Tenn. 1982) (holding that the habitual drug offender statue, which created a single offense based on three or more predicate drug sales and required the State to prove each of the predicate drug sales in a single trial, was not unconstitutional because there was no right to a bifurcated trial).

In an analogous separation of powers challenge to the habitual drug offender statute, the Tennessee Supreme Court rejected the defendant's argument that the statute violated separation of powers because it "amount[ed] to a mandatory joinder statute," and "circumvent[ed] the rules governing the admissibility of other crime evidence." See State v. King, 635 S.W.2d 113, 114 (Tenn. 1982). The court held:

> We do not agree with defendant's conclusory statement that the statute circumvents judicially imposed standards for the admissibility of other crime evidence. However, if we assume that to be the effect of the statute, no constitutional right of a defendant would be abrogated and the legislative power to declare as elements of the offense of habitual drug offender, a series of similar overt acts involving the sale of drugs, supersedes the judicial power to exclude other crime evidence in those circumstances.

Id. "The [L]egislature may distinguish among the ills of society which require a criminal sanction, and may punish them appropriately without violating constitutional limitations." State v. Hinsley, 627 S.W.2d 351, 355 (Tenn. 1982) (determining that habitual drug offender statute was constitutional).

We conclude that the Defendant is not entitled to relief on his constitutional challenges to the Child Protection Act.

The Defendant additionally asks in this appeal for this court to review an opinion of the Tennessee Attorney General and address the findings therein. The Defendant, however, failed to raise this issue in the court below and has therefore waived it on appeal. Moreover, for this court to embark on an unnecessary dissection of an attorney general opinion would

essentially amount to the rendering of an advisory opinion, which we have no right to do. See State ex rel. Lewis v. State, 347 S.W.2d 47, 48 (Tenn. 1961).

### III. Credibility Evidence

The Defendant lastly argues that case law, Larry Michael Berkley, 2016 WL 3006941, applied in his case to allow testimony about changes in the victims' behavior to assist the jury in evaluating the victims' credibility should be overturned. In Larry Michael Berkley, this court observed that it "has routinely permitted testimony from relatives regarding unusual changes in a child's behavior following instances of abuse because such evidence assists the jury in evaluating the credibility of the victim and is therefore relevant[.]" 2016 WL 3006941, at *8.

The admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will only be reversed on appeal if the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Robinson, 146 S.W.3d at 490 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."); Robinson, 146 S.W.3d at 490. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The primary issue in this case was the credibility of the victims, and proof related to the victims' behavioral changes was relevant to that issue. The trial court relied on the above-mentioned case law from this court to allow said testimony from the victims' mothers. The Defendant has not persuaded us that this court's earlier decision, which our supreme court declined to review, should be overturned.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE